Good morning, your honors, and may it please the court. I'm Robert G. Ryan for petitioner Matthew Hennick-Wakkary, who is in the courtroom today with his wife, Ivy. Thank you. I'd like to reserve two minutes for rebuttal, and I note that there is no credibility issue in this case. As we see it, your honors, there are two main issues in this case. First, whether in light of the recent decision in Hushjuf v. McKasey, the substantial evidence compels the conclusion that the petitioner has satisfied the extraordinary circumstances exception to the one-year filing deadline statute. Second, assuming arguendo that Mr. Wakkary does not satisfy the extraordinary circumstances exception to the one-year statute, the next issue would be whether the substantial evidence compels the conclusion that no reasonable adjudicator would have denied withholding of removal under the Immigration and Nationality Act and the Convention Against Torture on this record. Also, we are requesting that the court extend this favor group analysis under COTAS v. INS and SAIL v. Ashcroft to Mr. Wakkary. I understand if I'm right. District court judges have nothing to do with immigration, so you have to bear with me if I'm not right. Yes, Judge Breyer. As I understand it, the unanswered question is the applicability in the withholding context as well as the asylum context of the question that has been left unanswered by previous Ninth Circuit law. And I just don't know if that's true or not. And it's all about the disfavored group concept. Do you know anything about that? A, do you know if it's been left open by the circuit? And B, what do you think? Well, Judge Beyer, in fact, it has been left open by the circuit, we believe. The SAIL court at least implicitly left it open. When it mentioned in the footnote, it was not reaching the issues of INA withholding of removal and Convention Against Torture relief. That's in footnote 10, page 930 of SAIL. We are not aware of any reported case. How about O'Long? What is O'Long? How does O'Long fit in? O'Long, as we distinguished in our supplemental brief, doesn't really have any application here because in her case, nothing happened to her. Her case was a purely prospective asylum application. So the law of disfavored group analysis applies in this case. Excuse me, Judge Bresant. I was trying to say, all I was going to say was this. Doesn't the question of whether disfavored group analysis applies to withholding depend on what it is? In other words, I mean, what is the disfavored group analysis? Is it simply essentially an evidentiary observation that country, that if you have a group that the country reports and other documents in the record demonstrate is likely to be persecuted, that adds a certain amount of evidentiary support to the fact that the person is likely to be persecuted. That's all it is. Is there anything more than that? That's all it is, Your Honor. So therefore, therefore, in an asylum case, since you have to prove 10 percent, so if you get a bump up from the disfavored group analysis of 5 percent, then you only have to have 5 percent. But in the withholding situation, if you get a bump up of 5 percent, then you have to add 45 percent. So it's still there, but it's not serving as a larger role. Does that make sense? Yes, Your Honor, if I may just state it in this way as well. We are not at all saying that we're changing or we propose that the court change the 50 percent plus a feather burden of proof in withholding cases. We're saying, again, and really to restate what you're saying, Judge Brisson, we're just saying this is an evidentiary tool that the IJs and the BIA can use in these types of cases. Also, you agree that it's evidentiary. It isn't that Chinese ethnicity people in Indonesia are automatically entitled to this. They still have to put on a record. That is correct, Your Honor, and Lalonde says that. They have to put on some type of showing. But they also have to put on a record with regard to the disfavored group. In other words, can they just walk in and say, I'm a Chinese person from Indonesia, I get the 5 percent, or do they have to put in a record? They have to put something in. What Sayle said was you have to show something. As to the fact that it's a disfavored group, can they just walk in and say, I'm a Chinese person from Indonesia, and therefore I get the 5 percent for disfavored group and I only have to show the additional 45 percent? Or is it an evidentiary showing as well in each case that, in fact, it's a disfavored group? We believe what Lalonde says is that you have to show something, that something happened to you in order to get... You're missing the... Well, you walk into court, you have disfavored group membership if you're ethnic Chinese from Indonesia. But you have to prove that ethnic Chinese are a disfavored group in Indonesia. Well, you would... There's some evidence on that. You would have to in every case, and I think that's really a question of looking at the country conditions. If the country conditions were to get better, then the analysis changes. But right now, yes, we believe you walk into court with that, given the current country conditions. You walk into court with disfavored membership. It isn't just an evidentiary. That's what I'm trying to parse out. So you're saying it isn't just an evidentiary rule because, in fact, you don't have to put on the evidence. Well, under sale, the court specifically held that Indonesia's ethnic Chinese minority is a significantly favored group. That's the case law of the circuit. But isn't that a factual determination in that case? Yes, Your Honor, it is, because the court went to great pains. In that case, so why would you take that factual determination and just drop it into this case? Without some evidence in this record. We have evidence in this record. You do. Yes, you do. But I'm just trying to understand what the larger picture is. I mean, you have evidence in this record, and so I'm not sure you have the problem. But I'm just asking you, is this anything more than an evidentiary observation? If you could just walk in and not have to put anything on, then it would be something more than just an evidentiary observation. Well, it's a mixed question of law and fact, really, because the case law says they are disfavored. But you have to show, I would think in every case, that the conditions haven't changed so much that the analysis that the court went through in sale, pages 925 through 927, don't apply. I think that would be very difficult in the case of Indonesia. But as a practical matter, one goes in with disfavored group membership, but one has to show, as Lo Long did not, that something happened to you, discrimination, harassment, threats of violence, violence. So very quickly, because we've taken up most of your time, could you tell us quickly how all this applies to this case? I know you're going to have a chance in some other cases, but in this case. Well, with regard to Mr. Workari, there were incidents of being struck on the face back in August of 1985 by Native Indonesians. He was hit with a stick in 1990, my Native Indonesians. And he was asked for money at knife point in that instance. The IJ opinion was before sale. That is correct. He did say something about the disfavored groups. He didn't use the word disfavored groups, but he did say something about the country conditions. Then the BIA says, well, the analysis doesn't apply. As a matter of course, in every case, the IJ would make an observation on country conditions. I'll make sure you have time to rebut on this one, but I do want to spend a moment or two on the six-month issue, the one-year bar issue. Thank you, Judge Meyers. So he filed six months, three days after he fell out of status. Is that correct? Calculated 187 days. In the Husef case, it was 364 days. But he engaged due diligence in pursuing asylum. He was trying to get more evidence on the death, the killing of his friend, Caleb, in Indonesia. And as we said in page 11 of our brief, in hindsight, perhaps a skeletal application should have been filed earlier. But he never did it either. He never got it, right? He did not get the information. He made several attempts, as his declaration points out, asking his parents to ask Pastor Month for information for a statement. He did get information from the Internet that confirms the death. What do we do with the statement in Husef about the six-month limitation that's sort of recognized in the, I believe it was in the federal regulation when they were explaining the rule, and they say that anything beyond six months would probably be unreasonable. Judge Pius, that was the preamble to the one-year regulations. And in Husef, the court said in the absence of any special considerations, that would be that's not an unreasonable presumptive deadline. However, in the footnote, footnote four, if I may quote briefly, although we conclude that six months may serve in default as a reasonable presumptive deadline, we do not foreclose other reasonable periods and exceptions thereto that may be set by the agency, nor do we preclude individualized determinations of reasonableness of delay. That's this case, where he took affirmative steps, went to my co-counsel, and said, and had the discussion what to do, because his R1 visa had expired, or was about to expire. But he knew that was going to happen. I mean, it's not like that fell out of the sky either. That's true, Judge Berzon. But he did take affirmative steps. He didn't wait. But he waited until after his visa expired to even go to a lawyer. Well, one could do it before the visa expired, I suppose. Why didn't your co-counsel communicate with the immigration judge? Tell him we're on our way. We're just being delayed. Well, as we said in the brief, Judge Behr, in hindsight, something else should have been done, quite frankly. A skeletal application could have been filed, but we're waiting for this. No, I don't think it's not a fault issue. It's just that as a regular course of business, the sooner you let the court in on what you're doing, the more likely they are to be sympathetic and let you do it. So you would say that his effort to obtain evidence to support his application for asylum was reasonable? Yes, Your Honor, and it showed due diligence. I guess the question is, I mean, how much of a ‑‑ I mean, in the abstract, that sounds right. But how much of a showing would one have to make as to the actual details? I mean, here we have a situation where, as I say, you know, it does seem not so diligent to not do anything about the fact that your visa is about to expire until it expires. That's number one. And number two, it then took six months plus some, plus a couple days, to do what? I mean, he didn't actually get anything before he filed. To file his application form with the former INS on October 15, 2002. Because he was trying to get data, but that he filed without the data. That's correct, Your Honor. In hindsight, even a skeletal application might have been. There's a number of skeletons when it was filed that it would have been earlier. It could have been done differently, quite frankly. Okay. Let's hear from the ‑‑ Thank you. ‑‑ the government. I think both of you have at least the same, are both of you on all three cases? Your Honor, I'm only on the first of the two. Okay. That's a strange definition of responsibility. Maybe we should have been clearer about it. Good morning, Your Honors. May it please the Court. I'm Kristen Maraci, appearing on behalf of the Respondent, the U.S. Attorney General. Regarding the first issue this morning, the record does not compel the reversal of the agency's decision that the Petitioner's asylum application was not timely filed and that he failed to show extraordinary circumstances such that the untimely filing should be excused where the Petitioner waited longer than six months after his ‑‑ Well, would you agree that, on the right set of facts, that this could be a legitimate reason to go more than six months, i.e., the need to gather information if it were ‑‑ if they knew exactly what they were gathering and there were shown reasons why it took that long to gather them? Your Honor, I believe that under the facts of this case, it was not ‑‑ And ask that question. Yes. In general, could it be that the need to gather information to make an asylum showing could be a reason for going more than six months? Hypothetically, there could be a fact pattern in which that was reasonable or where longer than six months would be reasonable. So you're not saying that the reason isn't a good reason or isn't an adequate reason. It's just a question of what the facts were. I think under the facts of this case, it wasn't a reasonable period of time. And the record certainly doesn't compel the reversal of the agency's decision that it wasn't a reasonable period of time. If I ‑‑ as I meant to say, inquired, would you feel differently if they had immediately said we're going to Indonesia to get the police wreckage or whatever and we'll be back and talk to you again and we'd like some time to do it? Your Honor, again, the agency would have had to have looked at those circumstances and made a decision based on those circumstances. Is there any system for doing that? Is there some way in which you could have filed? It's not with the immigration judge. You would file with the asylum office, right? Yes. Is there some way he could have said, you know, I'm ‑‑ you know, I could file now, but I don't have the information I need. And so can I file a sort of holding application and then go get the material? Yes, Your Honor. In this case, the Petitioner could have filed his application as early as March, when he ‑‑ March of 2001. And that's not what I asked you. I asked you, could he have filed it and essentially gotten a continuance on putting in the requisite data for it? Yes, Your Honor. The Petitioner could have filed his asylum application and asked for additional time to supplement the record. Is there some likelihood he would have gotten that? Is there a system for doing that? Your Honor, we can't ‑‑ we can't say at this point, since he didn't escape discretion in the I.J.'s part, though, wouldn't it? Yes, Your Honor. It's not the I.J. who had anything to do with this, is it? Originally, it wouldn't be the I.J. It would be the office that he files the asylum application with. He wasn't dealing with the I.J. at that point, was he? At that point, he would have filed his application with the agency, but it would have been in the immigration judge's discretion to hold his case while he sought that additional information. So this ‑‑ I'm misinterested. I thought that asylum applications go to an asylum officer, and they only go to an I.J. if it's denied. Is that not right? Initially, when the Petitioner arrived and spoke with an asylum officer, that asylum officer initially denied ‑‑ would deny a Petitioner's claim, and then the asylum applicant ‑‑ or then the alien would file an asylum application, which would go to the immigration judge. And the immigration judge, in this instance, had the Petitioner filed his application and sought time to add to the record and add these documents that he claimed he was looking for. It would be in the immigration ‑‑ But what he didn't do within a year was not go to ‑‑ was file with the ‑‑ isn't there an office that you file asylum applications with? Yes. Affirmative ones? Yes, Your Honor. What he needs to do within the year is file with them, not go to the I.J. The I.J. is down the line. Is that right? Yes, Your Honor. Okay. So what the I.J. would have done or not done is not the question. The question is what would the asylum office or officer have done. Right? Well, whether or not the ‑‑ whether or not when it got passed to the immigration judge, he chose to hold that case to allow the Petitioner. Your Honor, I can't answer that. So when he filed ‑‑ I guess, let me see if I can ‑‑ assume he filed an affirmative application with the asylum office. Yes, Your Honor. Could they have held ‑‑ and he went in and said, okay, look, I don't have enough information. I know I don't have enough information here. Don't act on this. Yes, Your Honor. Do they have discretion to say, okay, we'll give you time to supplement your application? Yes, they do have the discretion to make that decision. At the asylum office? Yes. But it's discretionary even there. Is that correct? Yes, Your Honor. All right. Ms. Norezzy, again, just to show my ignorance, do you work out of a counsel's office at BIA or out of DOJ? No, Your Honor, out of DOJ. So do you do a lot of this work? We do. We do exclusively this work. Yes. They have an office of many people on oil that does all this, right? You've got to go easy on foreigners, as this case would show. Go ahead. Your Honor, with regard to the specific circumstances of this case, the Petitioner's argument as to why he waited longer than six months, as has been discussed, was because he was waiting on two individual documents, a letter from his pastor from a different pastor in Indonesia, and a police report regarding his friend's death. And as this Court said, these documents were never added into the record. Additionally, he knew as early as July or August of 2002 that he was going to be unable to get the letter that he was seeking from the pastor. However, he still waited until October 15, 2002, to file his application. As this Court had held in Haciev, absent a showing of special considerations, which are not present in this case, we would contend a six-month deadline is not an unreasonable deadline. And for that reason, we would contend that the record does not compel a reversal. This is just how many days over the six-month deadline? Three days over the six-month deadline. Do you have any idea as to what's actually happening on the ground? It's a six-month. It's a funny kind of a deadline, because it's not a deadline in either direction. So is the six months actually operating affirmatively in the sense that people who get their materials in within six months after the expiration of a visa are not being held to be late? Your Honor, that information isn't in the record of this case. I mean, there's something untoward about a deadline that you can't know what it is. Usually deadlines are deadlines one way or another. Yes, Your Honor. So you don't have any idea, whether if he had gotten it in on the day before the six-months run, whether he would have been any better off? No, Your Honor. That's not in the record of this case. Moving on to the second issue, Your Honor, the record also wouldn't compel the determination in this case that the Petitioner was eligible for withholding of removal or convention against torture protection because he didn't show that he more likely than not or a 51 percent chance that he would be persecuted or tortured should he return to Indonesia. All right. Now, the IJ in this case said the Court recognizes the traditional hostility in the course of deciding why he didn't think he had a well-founded, wasn't likely to be persecuted. The Court recognizes the traditional hostility of certain sectors of the Muslim community against the Christian minority as well as the hostility against the Chinese ethnics. Nonetheless, both of these communities have continued to prosper in Indonesia despite the hostility. So, in other words, one, it appears that he just didn't take into account any respect at all. In other words, he gave no evidentiary weight to his membership in these groups. Then the BIA then says, this favored group analysis doesn't apply, whatever that means. I don't know what they mean by that. So why don't we at least have to send this back to say, well, you at least have to take into account the record demonstrating that there is, in fact, some prevalence of persecution against these groups. So that's what I understand this favored group analysis to be, just take it into account as a weight in the determination. Well, Your Honor, we would agree. And the immigration judge did note that there's been ethnic and religious. No, he said it's nothing. It doesn't matter. Well, Your Honor, we would contend that that sentence shows that the immigration judge did consider that evidence in the record. But despite that evidence, the Petitioner still needs to show for his withholding of removal claim that he faces an individualized risk or that that information would show that he more likely than not, he himself would face persecution. All right. Then the BIA says we're not applying to favored group analysis. What do they mean by that? They mean that it doesn't matter what the country conditions are, you have to bear all of the burden of 50 percent plus hair on individualized determination. Is that what they mean? No, Your Honor. Certainly, the country condition evidence and all of the evidence in the record would still be relevant. However, we believe that the Board was simply noting that this Court's disfavored group analysis as it applies to asylum claims has not been extended to and the Board did not apply it to the Petitioner's withholding of removal claim. What is the disfavored group analysis other than the fact that if you are in a disfavored group, that goes some of the way towards showing future person, the likelihood of future persecution. What else is it? Your Honor, that is the test, we believe. All right. So then why wouldn't you apply it to withholding? Well, Your Honor, in this case, the Court in its previous decisions has not held it to withholding of removal. And we would contend that given the courts, the language that the courts have used in the past in addressing the disfavored group analysis in which the courts referred to reasonable fear and well-founded fear, it's been tailored to an asylum claim, which bears a very different burden of proof than a withholding of removal claim, whereas an asylum claim, a Petitioner merely has to show a 10 percent chance of persecution. Here, the Petitioner's burden was to show a 51 percent chance, or that he more likely than not would be persecuted. We would contend that the government or that the courts in its decision in Hotza even noted after finding in that case that the Petitioner did demonstrate eligibility for asylum under the disfavored group analysis, the Court went on to look at that Petitioner's withholding of removal claim and failed to note at any point in that analysis that it was using that test in considering the withholding of removal claim. And the Court noted in that case that even extensive evidence of abuse against a group and a showing that a Petitioner has an appreciably higher risk of persecution than others in that group, that still didn't compel the finding for the Court that it was more probable than not that that Petitioner would face persecution upon return. MS. MCGOWAN. I know, because as in Melong and Assail, you have to have individualized evidence as well. But so what? MS. NIEUSMA. Your Honor, we would again argue that this Court has not previously held it to withholding a removal claim. MS. MCGOWAN. We haven't previously. That's a true observation, but it doesn't have anything to do with what we do — what the logic of the situation is, depending on what this animal is, whether it applies or not. MS. NIEUSMA. Your Honor, I think the regulations, as they stand for withholding of removal claims, provide a sufficient and extensive framework for a petitioner to show that he would more likely than not be targeted. And certainly, country condition evidence and individual experiences would all come into play in showing that. But we don't believe that the disfavored group analysis should be extended to withholding removal claims. MS. MCGOWAN. Okay. MS. NIEUSMA. Thank you. MR. WACKER. Thank you, Your Honors. There's nothing that precludes this Court from applying disfavored group analysis to withholding cases, whether they be INA withholding or CAT. MS. MCGOWAN. All right. Suppose we thought that was true. What would we do with Mr. Wacker's case?  Well, based on the evidence, the evidence that we have, he has incurred discrimination, harassment, and violence because of his Chinese ethnicity. MS. MCGOWAN. Not much. I mean, as things go, right? MR. WACKER. Well, there was... MS. MCGOWAN.  When he was a little kid and stuff like that. MR. WACKER. Physical harm on two occasions. And then the harassment regarding the car incident in May of 1998 when he was a passenger in his father's car. And the people said, all Chinese and Christians, watch out, in so many words. And then the father, who is ethnic Indonesian, said, oh, we're all Indonesians. And so the perpetrators left. MS. MCGOWAN. I mean, more technically, would we remand to the agency to apply, to consider the country conditions somewhat if we thought they didn't? Or what would we do? MR. WACKER. We would suggest that the court do that. Certainly we want to extend this favor group analysis to these cases. We also ask the court to remand based on the one-year filing deadline issue as well. We would point out on that issue that the pastor said, according to Mr. Ricari's declaration, that if he were to provide a statement on the killing of Caleb, that he might further endanger himself in the country. So he did make attempts, but the reason given by the pastor was that he was fearful for his own well-being. MR. MCGOWAN. Let me ask you, do we have our understanding correct about an affirmative asylum application? That is, it's submitted to the asylum office or officer? MR. WACKER. Judge Pice, I'm glad you brought that up. We filed this affirmatively. It was an incredible fear interview. It was an affirmative asylum application with the former INS. Now CIS. The officer reviewed it. We brought up the one-year rule issue, of course, and they didn't agree. The case was referred to the IJ. We brought up the issue, of course, again, filed a motion to waive. MR. MCGOWAN. My question, though, was just to follow up. When you submitted the application, is it possible to ask the asylum officer to not take any action on the asylum application because you want to supplement it with additional information? MR. WACKER. We could have done that, Your Honor, but as a practical matter, at the asylum office, they look at the filing date, and that's where you have to deal with that. MR. MCGOWAN. I didn't hear what you said. MR. WACKER. We're dealing with the filing date. So if one were to ask for more time to supplement the record, that would be fine, but it still wouldn't cure the problem of having filed the application three days late. If you will, under the rules. MR. MCGOWAN. For them, it's the date. MR. WACKER. For them, it's the date. MR. MCGOWAN. They only care about the date.  In short, that is absolutely the case. MR. MCGOWAN. The one-year date? I mean, if it's not one year, they bump it. Or, Matt, is that what you're saying? MR. WACKER. They don't bump it. They have discretion. We think they should have exercised their discretion. MR. MCGOWAN. They will make a recommendation, essentially, to the I.J. But before the I.J., it's de novo. And there have been occasions where the asylum office will say, satisfy the one-year filing deadline exception, and the I.J. Rarely, but it's happened. The I.J. will say, no, it's de novo, and I'm reversing that. And it's gone the other way as well. MS. BENTON. Okay. But what do you mean, then, when you say they only look at the date?     I mean, if you could, if they have discretion to exercise, then the question is, can you look at the date? MS. WACKER. Well, you're right, Justice Brezans. They look at the date, and that's the problem here. They can exercise discretion if you satisfy the extraordinary circumstances exception. In this case, and there's a specific exception, by the way, when a person is in nonimmigrant status. That's specifically a regulatory exception under extraordinary circumstances. MR. BENTON.       And he's got a nonimmigrant status. And he's got a nonimmigrant status. And he's got a nonimmigrant status. And he went in and said, look, I know I've got all this good information I can use to supplement this application. Don't take any action on it yet. MR. BENTON. That would have been possible. MR. WACKER. Do they have discretion at that early date to say, okay, we'll give you three months. We'll give you four months. Go get your information and come back.       I can use it to supplement my application. I can use it to supplement my application. You can't just look at the date and say, look, that would be fairly unusual. They want to get these cases out. We have the 180-day clock. We have the 180-day clock. And they don't normally do that. They have backlogs. They say, you know, pretty much, sorry, you can do it later before the judge. I mean, that's essentially how it works.   They'll kick it to the judge, basically, is what you're saying.  WACKER. Yes. MR. BENTON. And then the judge would have discretion to give him    Correct. And that's why we filed a declaration on the one-year issue and went into extensive detail in that declaration. And, again, I can use it to supplement my application. MR. BENTON.   BENTON. And then we supplemented it with the Internet articles regarding the killing of its friend, Mr. Caleb.  BENTON.  Thank you. MR. BENTON.  MR. BENTON. I guess you might as well just stay right there and not  MR. BENTON. I have to get another file out here. MR. BENTON. Okay. Get your other file. MR. BENTON. Thank you. MR. BENTON.   All right. MR. BENTON. Thank you. MR. LEBRECHT. Congratulations.
judges: Paez, Berzon, Baer